## SAXTON *v.* BOARD OF TRUSTEES OF THE FIRE AND POLICE EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF BALTIMORE

[No. 38, September Term, 1972.]

*Decided November 10, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH and LEVINE, JJ.

*Samuel M. Campanaro* for appellant.

*Simon Schonfield, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Clayton A. Dietrich, Chief Assistant City Solicitor,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

Mrs. Saxton, the widow of John R. Saxton who had retired from his position as a lieutenant in the Baltimore

City Fire Department (the Department) after almost 29 years of service and about eight months prior to his death, instituted mandamus proceedings in the Baltimore City Court to require The Board of Trustees of the Fire and Police Employees Retirement System (the Board) to award her special death benefits. This appeal was taken from an order denying the writ.

The facts, which were stipulated, may be briefly summarized. Lieut. Saxton joined the Department in August 1940. In May 1968, he sustained incapacitating injuries while performing his duties. For a year, although disabled, he was paid his full salary. On 7 May 1969, he was involuntarily retired and requested and was awarded a special disability benefit provided for by Baltimore City Code (1966) (the Code) Art. 22, § 34 (e):

"(e) *Special disability benefit.* Upon the application of a member or the head of his department, any member who has been totally and permanently incapacitated for duty as the result of an injury arising out of and in the course of the actual performance of duty, without wilful negligence on his part, shall be retired by the Board of Trustees, provided that the medical board shall certify that such member is physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired.

"(f) *Allowance on special disability benefit.* Upon retirement for special disability a member shall receive a special disability retirement allowance which shall consist of:

(1) an annuity which shall be the actuarial equivalent of his accumulated contributions at the time of his retirement; and

(2) a pension, in addition to the annuity, of sixty-six and two-thirds per cent of his average final compensation."

On 1 January 1970, Lieut. Saxton, after receiving a special disability benefit for about eight months, died of the injuries he had sustained. In May 1970, Mrs. Saxton filed with the Board an application for special death benefits, which was denied, not because Lieut. Saxton's death had not been caused by the injuries, but because Lieut. Saxton had retired prior to his death.

The Code, Art. 22, § 34 (i) provides:

> *"Special death benefit.* Upon the receipt of proper proofs of the death of *a member in service* arising out of and in the course of the actual performance of duty . . . there shall be paid: (1) [to his designated beneficiary, and if none, to his estate, his accumulated contributions and a pension of 100% of his current compensation] (2) To his widow to continue during her widowhood . . . ." (Emphasis supplied)

Mrs. Saxton reads the provision to mean that a special death benefit may be paid to a member whose death results from an injury sustained while he was in service. The Board's response is that a special death benefit is payable only as a consequence of a death arising out of and in the performance of duty of a member in service at the time of his death.

The court below accepted the Board's interpretation of the Ordinance, as do we. This is buttressed by the definitions set forth in Art. 22, § 30 of the Code:

> "(3) 'Member' shall mean any person included in the membership of the system as provided in Section 31 of this subtitle.
>
> * * *
>
> "(6) 'Service' shall mean service as an employee paid for by the City of Baltimore.
>
> * * *
>
> "(16) 'Retirement' shall mean withdrawal from active service with a retirement allowance

granted under the provisions of this sub-
title."

It seems clear to us that Mrs. Saxton cannot escape the
clear expression of legislative intent articulated by the
definitions: That a "member in service" is a fire fighter
who was killed in line of duty or died prior to retire-
ment from injuries sustained while performing his du-
ties, as distinguished from a member who had left the
service, was not performing official duties, and was
merely receiving retirement benefits, even though the in-
jury sustained in line of duty may have been the cause
of death.

Mrs. Saxton pins her hopes on what she regards as
the legislative history of Code, Art. 22, § 34 (i). She
points out that prior to 1926, fire fighters and their de-
pendents were provided for under a noncontributory
system of benefits provided by Baltimore City. The Char-
ter and Public Local Laws of Baltimore City (1949), §
80 provided for the relief of widows and children of
fire department members, not covered by the Employees
Retirement System of the City who "have died within
one year as a result of injuries sustained in the per-
formance of [their] duties."

In 1956, § 80 was amended, and while still applicable
only to fire department employees not covered by the Em-
ployees Retirement System, eliminated the provision that
death must occur within one year from the date when
injuries were sustained in order for widows and chil-
dren to be entitled to benefits.

It is not argued that these provisions are directly ap-
plicable to Lieut. Saxton, who was a member of the
Employees Retirement System. But Mrs. Saxton con-
tends that the progenitors of Code (1966), Art. 22, § 34
(i) were Baltimore City Code (1927), Art. 30, § 6 (9)
and Baltimore City Code (1950), Art. 23, § 6 (9) (a),
neither of which limited entitlement to death benefits to
instances where death occurred in service, if it were oc-
casioned by injuries sustained in line of duty.

Using this as a starting point, Mrs. Saxton moves on to argue that a pension law, being remedial legislation, should be liberally construed, citing *Police Comm'r of Balto. City v. King,* 219 Md. 127, 134, 148 A. 2d 562 (1959) and *Adams v. Board of Trustees,* 215 Md. 188, 196, 137 A. 2d 151 (1957). *See also* 3 Antieau, *Municipal Corporations Law* § 22.15, at 288.2 (1971); 2 Yokely, *Municipal Corporations* § 357 (a), at 203 (1957). The short answer to this contention is that Baltimore City Code (1966), Art. 22, § 34 (i), when read in the light of the definitions contained in the ordinance, presents no ambiguity and poses no problems of statutory construction. If the wording of a law is clear, its literal meaning should not be tortured into something else, *Police Comm'r of Balto. City v. King, supra,* 219 Md. at 134; *Travers v. Fogarty,* 187 Md. 348, 353, 50 A. 2d 238 (1946); *Duncan v. Graham,* 155 Md. 507, 510-11, 142 A. 593 (1928). The right to a pension depends upon the controlling statutory provisions and the claimant must satisfactorily perform and meet all conditions precedent. 3 Antieau, *supra* § 22.15, at 288.3; 60 Am. Jur. 2d, *Pensions and Retirement Funds* § 46, at 918 (1972). Even the *King* case, relied on by Mrs. Saxton, held that death benefits payable to the family of a policeman who "dies of injuries sustained on active duty" could not be claimed when death resulted from injuries which were not sustained "in the actual performance of duty."

The ground rules here, to put it quite simply, were changed prior to the date when Lieut. Saxton sustained his injuries. In all states municipal corporations may make reasonable modifications of a pension plan at any time before the happening of the defined contingencies, 3 Antieau, *supra* § 22.15, at 288.6-288.8; 60 Am. Jur. 2d *supra,* § 64, at 939-41.

Nor is *Acford v. Auditor of City of Cambridge,* 300 Mass. 391, 15 N.E.2d 449 (1938), on which Mrs. Saxton relies, apposite here. There, the statute had been amended to remove a time limit within which death must occur for there to be an entitlement to death benefits. As re-

vised, the Act provided that death benefits would be paid,

"If a member of the police or fire force of a city . . . is killed, or dies from injuries received, while in the performance of his duty as a member of such force . . . [and it is established] that such death was the natural and proximate result of an accident occurring during the performance . . . of his duty . . . [and] that the death was the direct result of the said injury. . . ."

It is patently clear that the statute before the Court in *Acford* is the diametric opposite of that with which we are here concerned, because the Massachusetts statute had eliminated any time requirement, while the one before us clearly posits entitlement upon death of a "member in service." Similarly, in other cases where there occurred a lapse of time between an injury sustained in the line of duty and death, the statutes there involved failed to include language as definite as that of the Code, *Casserly v. City of Oakland,* 215 Cal. 600, 12 P. 2d 425 (1932) ; *Police Comm'r of Balto. City v. King, supra,* 219 Md. at 127; *Mook v. City of Lincoln,* 146 Neb. 779, 21 N.W.2d 743 (1946) ; *Silson v. New York State Employees' Retirement Sys.,* 144 N.Y.S.2d 476, 208 Misc. 59 (1954) ; *see* 60 Am. Jur. 2d, *supra* § 53, at 925; Annot., *Relationship Between Fireman's or Policeman's Performance of Official Duties and His Death, for Purpose of Recovery of Benefits by Survivors,* 27 A.L.R.2d 1004 (1953). These cases require only that there exist proximate cause between the injury sustained while on duty and the subsequent death of the employee. However, the clarity of Art. 22, § 34 (i) and definitions incorporated in the Code deny this Court the latitude which would be required to predicate the disposition of this case on proximate cause alone.

*Order affirmed, costs to be paid by appellant.*